EARL L. MOORE, Petitioner, *v.* DISTRICT COURT OF
BAYAMÓN, Respondent.

No. 1261. Argued November 24, 1941.—Decided December 22, 1941.

*Mariano Acosta Velarde* and *Federico Acosta Velarde* for petitioner.
*Lionel Fernández Méndez, Alejandro Romanace,* and *Dubón &*
*Ochoteco* for intervener, plaintiff in the main action. *Norman A.*
*Littell, Assistant Attorney General of the United States, A. Cecil*
*Snyder, U. S. Attorney, Adolfo Valdés, Assistant U. S. Attorney,*
*Charles R. Denny, W. Robert Koerner* and *Donnald R. Marshal,*
*Attorneys of the U. S. Department of Justice,* as *amici curiae.*
*George A. Malcolm, Attorney General, Jesús A. González, Assis-*
*tant Attorney General,* for the People of Puerto Rico, as *amicus*
*curiae.*

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the
court.

The question to be determined in this case is whether a
summons served on a defendant within the Naval Air Base
of the United States of America located in San Juan, Puerto
Rico, vests an insular court, in which the action was brought,
with jurisdiction over the person of the defendant.

On May 13, 1940, Esther Gandía de Cabán, Tomás Gan-
día, Jr., and Juana Rivera de Gandía, brought, in the Dis-
trict Court of Ponce, an action against Earl L. Moore to re-
cover $10,000 as damages for the death of Tomás Gandía
Rodríguez in consequence of injuries inflicted on him by an
airplane belonging to the defendant, on June 25, 1939, on
land located in Bayamón.

The summons was finally served on the defendant by the marshal of the court on December 2, 1940, as evidenced by the following certificate:

*"I hereby certify:* That I received the present summons at 10 a.m. on December 2, 1940, and that at 2 p.m. on December 2, 1940, I personally served the same on Earl Moore, the defendant mentioned in said summons, in the Naval Base, by delivering to said defendant and leaving with him personally in the ward of Santurce, San Juan, P. R., a copy of said summons and a copy of the complaint mentioned in said summons, and I set down, over my signature, on the back of said copy of the summons the place and time of such delivery and service."

On December 19, 1940, the defendant appeared specially for the purpose of moving to quash the summons as invalid, since the same was served in the San Juan Naval Base, which has been built on land reserved for the purpose by the United States of America pursuant to Act No. 32 of Puerto Rico, enacted on April 19, 1939 (Session Laws, p. 362), and which is Federal territory under the exclusive jurisdiction of the United States, according to an act of Puerto Rico, approved February 16, 1903 (Session Laws, p. 110).

The court heard both parties and finally, on August 22, 1941, denied the motion of the defendant and held that the court had jurisdiction of his person, acquired by virtue of the summons, and granted him ten days to answer the complaint.

At this stage, on the following September 3, the defendant presented a petition for certiorari to the acting judge in vacation of this court. Said judge ordered the issuance of the writ and heard the parties. He then set the case to be heard anew by the full court, such hearing taking place on November 24, 1941, with the appearance of the petitioner and of the plaintiff in the main action through their respective counsel who submitted their arguments, and of the representatives of the People of the United States and of the People of Puerto Rico who, as *amici curiae,* maintainied that

Puerto Rico had lost all jurisdiction over the land conveyed to the United States for the construction of the naval air base involved herein.

The decision of the district court which is sought to be reviewed, reveals a painstaking study of the question involved. In the last but one paragraph of the opinion, the court's viewpoint is stated thus:

"Therefore, we are of opinion that the jurisdiction of the Government of the United States over the land of Isla Grande where the Naval Base is built, is confined to such jurisdiction as is required in order that the Federal Government may carry out and execute the purposes for which it acquired said land, and that the People of Puerto Rico has been deprived of jurisdiction over said land only in so far as the exercise of such jurisdiction might hinder or obstruct the execution of said federal projects. *United States* v. *Unzeuta*, 281 U.S. 138; *Ryan* v. *State*, 188 Wash. 115, 61 P. (2d) 1276, *Fort Leavenworth R.R. Co.* v. *Lowe*, 114 U.S. 525, 29 L. Ed. 264. The jurisdiction of the Federal Government over the land of said Naval Base is not, therefore, exclusive, said land being still subject to the insular jurisdiction."

It is indisputable that the summons in question was served within the limits of Isla Grande, in San Juan, Puerto Rico, where a naval air base of the United States of America has been built; that said land formerly belonged to the Spanish Crown and subsequently became the property of the United States by virtue of the Treaty of Paris of 1898; that in pursuance of the public policy adopted by the Congress of the United States, the said land was conveyed to the People of Puerto Rico (*People* v. *Dimas et al.*, 18 P.R.R. 1019, and *People* v. *Municipality of San Juan*, 19 P.R.R. 625); and, lastly, that the People of Puerto Rico, by Act No. 32 of 1939 (Session Laws, p. 362), authorized and directed the Commissioner of the Interior in the name and on behalf of the People of Puerto Rico to convey, as he did convey, every right, title, and interest which it held therein to the United

States to be used, as it has been used, for a naval air base of the United States and for other naval activities.

That being so, did the United States acquire exclusive jurisdiction over the base or only such as was required to carry out and execute the purposes for which the land had been conveyed, the People of Puerto Rico retaining its jurisdiction to be exercised in so far as the same did not obstruct the execution of such purposes?

As pertinent to the question there is invoked, in the first place, Clause 17, Section 8, Article 1 of the Constitution of the United States, which vests the Congress with power:

"To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the Seat of the Government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

However, said clause which expressly mentions state legislatures, is not applicable to the organized and unincorporated territory of Puerto Rico, *Balzac* v. *Porto Rico,* (1922), 258 U. S. 298, 304, 305; *Downes* v. *Bidwell,* (1901), 182 U. S. 244; *Lastra* v. *New York & Porto Rico SS. Co.,* (C.C.A. 1, 1924), 2 F. (2d) 812; *Gallardo* v. *Santini Fertilizer Co.,* (C. C.A. 1, 1926), 11 F. (2d) 587; *Sancho* v. *Bacardi Corporation of America,* (C.C.A. 1, 1940), 109 F. (2d) 57, 63.

The applicable legal provision is that invoked by the petitioner, namely, the Act authorizing the Governor of Puerto Rico to convey certain land to the United States for naval, military or other public purposes, approved on February 16, 1903 (Session Law, p. 110; Comp. Stat. 1911, p. 322), whose section 5 prescribes as follows:

"That consent be and is hereby given to the United States to acquire for naval, military or other public purposes, by purchase or condemnation, any lands within the Island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United

States, all jurisdiction over such lands by The People of Porto Rico shall cease and determine: *Provided, however,* That upon the subsequent alienation by the United States of any land so acquired The People of Porto Rico shall again have jurisdiction thereover.''

As may be seen, the Puerto Rican statute and the constitutional clause above cited coincide in that the jurisdiction of the United States shall be exclusive where the acquisition of land in the States, with the consent of their legislatures, is effected by purchase and for the construction of forts, powder houses, arsenals, docks and other necessary buildings (National Constitution), by purchase or condemnation, for naval, military or other public purposes (Territorial Statute). Therefore, resort can and should be had to the decisions construing the constitutional clause in order to determine the scope of the territorial legal provision.

The special act—Act No. 32 of 1939, Sess. Laws, p. 362—which authorized the conveyance, contains no express provision bearing on the jurisdictional question, but it is maintained that, inasmuch as what has been ordered therein and executed by virtue thereof is actually a purchase, the jurisdictional question should be settled in the sense of granting exclusive jurisdiction to the United States by applying the 1903 Act.

If a purchase were involved, the issue would be settled as suggested above, but the authorities cited fail to sustain, in our opinion, such a conclusion. Nor is it sustained by the argument that the land had been conveyed as a *quid pro quo* conveyance in consideration of a promise to build a base.

The statute is definite. It speaks of the acquisition by ''purchase or condemnation'' and provides as regards the land that ''when so-acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by the People of Porto Rico shall cease and determine''; the discontinuance of jurisdiction being thus made dependent upon the form of acquisition.

The difficulty in deciding this case lies in the fact that some of the use for which the land was conveyed seems to require the exclusive jurisdiction, in accordance with the public policy proclaimed both in the constitutional clause and in the territorial statute, and, on the other hand, the express determination of the mode of acquisition militates against the inclusion of other modes.

A similar state of facts led Judge Robert W. Hughes of the Federal District of Virginia, in his decision in *Crook, Horner & Co.* v. *Old Point Comfort Hotel Co. et al.*, 54 F. 604, 608 to 610, to express himself in his opinion partly as follows:

". . . Congress having failed to enact any legislation for the government, in civil affairs, of persons sojourning permanently or temporarily at military posts, upon grounds held by the United States, it is important to inquire whether the inhabitants of Old Point Comfort are without law governing their social and civil life, and their transactions in business and commerce, except such as may have been in force in Virginia more than half a century ago. It will have been observed from the clause of the constitution which has been quoted that its language is that congress shall have power of exclusive legislation 'in all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, arsenals,' etc. This language has been construed by the supreme court of the United States in the cases of *Railroad Co.* v. *Lowe*, 114 U.S. 525, 5 Sup. Ct. Rep. 995, and *Railroad Co.* v. *McGlinn*, 114 U.S. 542, 5 Sup. Ct. Rep. 1005, in which it was held that the word 'purchase,' as used in the clause of the constitution under consideration, has not the general technical meaning belonging to it at common law of any acquisition of lands other than by descent or inheritance, but has only the meaning of an acquisition of land by actual purchase. It held, moreover, that where land is acquired by the United States in any other manner than by such actual purchase, with the consent of the state, attended by a cession from the state of all jurisdiction over it, there the clause of the constitution giving the power of exclusive legislation to congress, and giving exclusive jurisdiction to the United States, does not apply. The court held that in this class of cases the United States takes the lands only under such a tenure, limited or unlimited, as the state confers by each special

act of cession, and that such title is to be dealt with by the courts precisely as if the land had been ceded by the state to a private individual.

"In the *McGlinn* Case, describing its decision in the *Ft. Leavenworth* Case, the supreme court said:

" 'In order that the United States may possess exclusive legislative power over the tract, . . . they must have acquired the tract by purchase, with the consent of the state. This is the only mode prescribed by the federal constitution for the acquisition of exclusive legislative power over it. When such legislative power is acquired in any way, as by an express act ceding it, its cession may be accompanied with any conditions not inconsistent with the effective use of the property for the public purposes intended. We also held that it is competent for the legislature of a state to cede exclusive jurisdiction over places needed by the general government in the execution of its powers, the use of the places being in fact as much for the people of the state as for the people of the United States generally, and such jurisdiction necessarily ending when the places cease to be used for those purposes.'

"However much these decisions may have disturbed opinions previously entertained by the legal profession, they are the supreme law of the land, and must be enforced by the courts. An inspection of the act of cession of Virginia conveying to the United States the lands of Old Point Comfort, belonging to herself, and not purchased by the United States, with her consent, from any other owner, and ceding jurisdiction over them, will show that the case falls within the ruling of the supreme court in the two cases of *Railroad Co.* v. *Lowe* and *Railroad Co.* v. *McGlinn;* and that Fortress Monroe is held by the United States, not subject to clause 17, sec. 8, art. 1, of the constitution, but only by the tenure prescribed by Virginia's act of cession of March 1, 1821, and her governor's deed of cession of December 12, 1838. These acts contain quite a number of very material limitations of the power of the United States over the land at Old Point Comfort, and provide expressly for the reversion of the land to this commonwealth, and their revestment in her, in the event of their future abandonment by the United States, or appropriation to any other purposes than those of fortification and national defense.

" *      *      '   *      *      *      *      *

"I think it is clear from the foregoing recital that the jurisdiction of the United States over the territory held by them at Old Point Comfort is not the absolute, exclusive jurisdiction conferred by the

federal constitution over places purchased by consent of states; but is such jurisdiction only as was conferred by Virginia's act and deed of cession. It would seem to be equally clear that, except as to the parts of that territory not in actual use by the federal government for military purposes, whether appropriated to other purposes or not, the jurisdiction of the state is concurrent with that of the United States, and that such laws of Virginia as are not incompatible with those of the United States affecting that territory, and as do not conflict with the free use by the United States of the parts of the land actually used for military purposes, are themselves in force, and constitute the rule of conduct for the government of all inhabitants there who do not belong to the army of the United States.''

The above decision, rendered in 1893, was cited and applied in subsequent cases. See *Concessions Co.* v. *Morris, Sheriff, et al.*, decided by the Supreme Court of Washington in 1919, 186 Pac. 655, 662: and *State* v. *Bruce*, decided by the Supreme Court of Montana in 1937, 69 P. (2d) 97, 102.

Such being the facts and the law, we must hold that the defendant was validly summoned and that the District Court of Bayamón acquired jurisdiction of his person in the action brought against him for damages caused by acts which were performed within its territorial limits.

Our construction of the 1903 statute is not new. In *People* v. *Suárez*, 51 P.R.R. 877, 884, this court speaking through Mr. Justice Travieso said:

''Section 6 of the Act of February 16, 1903, of our Insular Legislature, does not help the appellant either in his efforts to maintain the alleged presumption of exclusive jurisdiction of the Federal Court over the offense charged against him. By the terms of said section, the People of Puerto Rico, conforming to the doctrine established by the decisions we have cited, ceded exclusive jurisdiction to the United States over the lands which the Federal Government might acquire in the future in Puerto Rico, *by purchase or eminent domain.* The fact, then, that the Federal Government occupies a building as a post office is not in itself sufficient to cause the exclusive jurisdiction of the federal courts to arise as an unavoidable consequence of such mere occupancy. It is necessary that the Federal Government should have

purchased or expropriated the building. This fact can not be presumed, it must be proved by the person relying on it. And once it is proved, the federal jurisdiction is established by virtue of said section of the Act of February 16, 1903.

"Exclusive jurisdiction is never presumed. He who claims it must prove it."

See also *West India Oil Co. (P. R.)* v. *Treasurer,* 54 P.R.R. 695, 701.

Having reached the above conclusion, it is unnecessary for us to consider at length the second ground relied upon by the district court for denying defendant's motion, to wit, the failure to show that the United States had accepted or assumed exclusive jurisdiction over the base. The order is affirmed on the first ground, but it is well to say that, after considering the question, we feel inclined to hold that in the latter respect our judgment would be adverse to that of the trial court.

The writ issued must be discharged and the case remanded to the district court for further proceedings in accordance with the law.