Karl L. Moore, peticionario, *v.* Corte de Distrito de Bayamón, Hon. E. Ponsa Parés, Juez, demandada.

Núm. 1261.—*Sometido:* Noviembre 24, 1941. *Resuelto:* Diciembre 22, 1941.

*Mariano Acosta Velarde* y *Federico Acosta Velarde,* abogados del peticionario; *Lionel Fernández Méndez, Alejandro Romanace* y *Dubón & Ochoteco,* abogados del interventor, demandante en el pleito principal; *Hon. Subprocurador General de los Estados Unidos Norman A. Littell, A. Cecil Snyder, Fiscal Federal, Adolfo Valdés, Fiscal Federal Auxiliar* y *Charles R. Denny, W. Robert Koerner* y *Donnald R. Márshal,* abogados del Departamento de Justicia federal, como *amicus curiae; Hon. Procurador General George A. Malcolm* y *Jesús A. González, Procurador General Auxiliar,* abogados de El Pueb'o de Puerto Rico, como *amicus curiae.*

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

La cuestión a resolver en este caso es la de si un emplazamiento hecho en persona a un demandado en la Base Naval Aérea de los Estados Unidos de América situada en San Juan de Puerto Rico, confiere jurisdicción a la corte insular en la que se radicó el pleito, sobre la persona del demandado.

El 13 de mayo de 1940, Esther Gandía de Cabán, Tomás Gandía, Jr. y Juana Rivera Viuda de Gandía, radicaron en la Corte de Distrito de Bayamón una demanda dirigida con-

tra Earl L. Moore en reclamación de diez mil dólares por daños y perjuicios sufridos a virtud de la muerte de Tomás Gandía Rodríguez, a consecuencia de heridas que le produjera un aeroplano propiedad del demandado en 25 de junio de 1939 en terrenos situados en Bayamón.

La citación del demandado se hizo finalmente por el márshal de la corte el 2 de diciembre de 1940, según su certificación, como sigue:

"*Certifico:* Que recibí el presente emplazamiento a las 10:00 de la mañana del día 2 de diciembre de 1940, y que a las 2:00 de la tarde del día 2 de diciembre de 1940, notifiqué el mismo personalmente a Earl Moore en la Base Naval, demandado mencionado en dicho emplazamiento, entregando a dicho demandado y dejando en su poder personalmente en Barrio Santurce, San Juan, P. R., una copia de dicho emplazamiento y en poder del demandado una copia de la demanda mencionada en dicho emplazamiento, habiendo hecho constar con mi firma al dorso de la copia del emplazamiento el sitio y fecha de su entrega y notificación."

El 19 de diciembre de 1940 el demandado compareció especialmente para pedir la eliminación de los autos del emplazamiento por inexistente, ya que se hizo en la Base Naval de San Juan, construída en terrenos reservados para ese fin por los Estados Unidos de América de acuerdo con la ley núm. 32 de Puerto Rico, aprobada en abril 19, 1939, pág. 363, que constituye territorio federal bajo la jurisdicción exclusiva de los Estados Unidos, según ley de Puerto Rico de febrero 16, 1903, pág. 112.

Oyó la corte a ambas partes y finalmente, en agosto 22, 1941, declaró sin lugar la moción del demandado y resolvió que tenía jurisdicción sobre su persona, adquirida a virtud del emplazamiento, y le concedió diez días para que contestara la demanda.

Así las cosas, en septiembre 3 siguiente el demandado presentó una petición de *certiorari* ante el juez de turno de este tribunal que se encontraba entonces en vacaciones. Ordenó el juez la expedición del auto y oyó a las partes.

Luego señaló una nueva vista para ante el tribunal en pleno que fué en efecto celebrada en noviembre 24, 1941, con asistencia del peticionario por su abogado y de la parte demandante en el pleito por el suyo, sosteniendo sus respectivas posiciones, y de representantes del Pueblo de los Estados Unidos y del Pueblo de Puerto Rico que, como amigos de la corte, mantuvieron el criterio de que Puerto Rico había perdido toda jurisdicción sobre los terrenos que traspasara a los Estados Unidos para la construcción de la base naval aérea de que se trata.

La resolución del tribunal de distrito que se impugna revela un cuidadoso estudio de la cuestión envuelta. Su penúltimo párrafo resume su criterio como sigue:

"Somos de opinión por consiguiente que la jurisdicción del Gobierno de Estados Unidos sobre los terrenos de Isla Grande donde radica la Base Naval se limita a aquella jurisdicción necesaria para que el Gobierno Federal pueda llevar a cabo y desarrollar los propósitos para los cuales adquirió dichos terrenos, y que el Pueblo de Puerto Rico ha sido privado de su jurisdicción en dichos terrenos solamente en tanto en cuanto el ejercicio de dicha jurisdicción entorpezca u obstaculice la realización de dichos propósitos federales. *United States* v. *Unzeuta,* 281 U. S. 138, *Ryan* v. *State,* 188 Wash. 115, 61 P. (2d) 1276, *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, 29 L. Ed. 264. La jurisdicción del Gobierno Federal sobre los terrenos de dicha Base Naval no es por consiguiente exclusiva, existiendo aún sobre dicho sitio la jurisdicción insular."

Son hechos indiscutibles que el emplazamiento de que se trata se hizo dentro de los terrenos de Isla Grande, en San Juan, Puerto Rico, en los que se ha construído una base naval aérea de los Estados Unidos de América; que dichos terrenos pertenecieron a la Corona de España y luego a los Estados Unidos a virtud del Tratado de París de 1898; que siguiéndose la política pública adoptada por el Congreso de los Estados Unidos, dichos terrenos fueron traspasados al Pueblo de Puerto Rico (*El Pueblo* v. *Dimas, et al.,* 18 D.P.R. 1061, y *El Pueblo* v. *Municipio de San Juan,* 19 D.P.R. 656), y que, por último, El Pueblo de Puerto Rico por ley núm.

32 de 1939, pág. 363, autorizó y ordenó a su Comisionado del Interior para que a su nombre y en su representación traspasara como traspasó todo derecho, título e interés que tenía sobre los mismos a los Estados Unidos, para ser usados, como lo han sido, como base naval aérea de los Estados Unidos y para otras actividades navales.

Siendo ello así, ¿adquirieron los Estados Unidos jurisdicción exclusiva dentro de la base o sólo aquella necesaria para llevar a cabo y desarrollar los propósitos para los cuales le fueron los terrenos traspasados, conservando la suya el Pueblo de Puerto Rico para ejercerla en tanto en cuanto no entorpeciere la realización de los mismos?

Para resolver la cuestión se invoca en primer término el Artículo 1, sección 8, cláusula 17 de la Constitución de los Estados Unidos que otorga poder al Congreso para:

"Ejercer legislación exclusiva en cualquier caso, sobre determinado distrito (que no exceda de diez millas en cuadro) que pueda, mediante cesión de alguno de los Estados y la aceptación del Congreso, convertirse en la sede del Gobierno de los Estados Unidos, y para ejercer igual autoridad sobre todos los sitios comprados con el consentimiento de la Legislatura del Estado donde los mismos radiquen, para la construcción de fuertes, polvorines, arsenales, muelles y otros edificios necesarios."

Sin embargo, esa cláusula que habla expresamente de legislaturas estaduales no es aplicable al territorio organizado y no incorporado de Puerto Rico. *Balzac* v. *Puerto Rico*, (1922), 258 U. S. 298, 304, 305, *Downes* v. *Bidwell*, (1901), 182 U. S. 244, *Lastra* v. *New York & Porto Rico SS. Co.*, (C.C.A. 1, 1924), 2 F. (2d) 812, *Gallardo* v. *Santini Fertilizer Co.*, (C.C.A. 1, 1926), 11 F. (2d) 587, *Sancho* v. *Bacardí Corporation of America*, (C.C.A. 1, 1940), 109 F. (2d) 57, 63.

La disposición legal aplicable es la invocada por el peticionario o sea la ley autorizando al Gobernador de Puerto Rico para traspasar ciertos terrenos a los Estados Unidos para fines navales o militares y para otros fines públicos,

aprobada ·el 16 de febrero de 1903, pág. 112, Compilación de 1911, pág. 344, cuya sección 5 dispone:

"Que se dé y por la presente se da, el consentimiento a los Estados Unidos para adquirir, para fines navales o militares u otros fines públicos, por compra o expropiación forzosa, cualesquiera terrenos en la Isla de Puerto Rico, y cuando fuesen adquiridos en esta forma, y los Estados Unidos hayan tomado posesión de los mismos, toda jurisdicción sobre tales terrenos por parte de El Pueblo de Puerto Rico cesará y terminará ipso facto. Disponiéndose, no obstante que, si subsecuentemente los Estados Unidos enajenaren cualquiera o todas las tierras adquiridas en esta forma, El Pueblo de Puerto Rico volverá a tener jurisdicción sobre las mismas."

Como puede verse la ley de Puerto Rico y la cláusula constitucional citadas coinciden en que la jurisdicción de los Estados Unidos será exclusiva cuando la adquisición de tierras en los estados con el consentimiento de sus legislaturas lo sea por compra y para la construcción de fuertes, polvorines, arsenales, muelles y otros edificios necesarios (Constitución Nacional), por compra o expropiación, para fines navales o militares u otros fines públicos (Ley del Territorio). En tal virtud puede y debe recurrirse a la jurisprudencia interpretativa de la cláusula constitucional para fijar el alcance de la disposición legal del territorio.

La ley especial—la núm. 32 de 1939, pág. 363—que decretó el traspaso, no contiene disposición alguna expresa sobre la cuestión jurisdiccional, pero se sostiene que siendo lo ordenado por ella y lo realizado a virtud de ella en realidad una compra, la cuestión jurisdiccional en el sentido de la exclusividad para los Estados Unidos se resuelva aplicando la ley de 1903.

Si en verdad se tratara de una compra, la cuestión quedaría resuelta en el sentido indicado, pero las autoridades que se citan no sostienen ·a nuestro juicio esa conclusión. Tampoco la sostiene el argumento de que el terreno se traspasara como un quid pro quo—traspaso mediante promesa de base.

La ley es terminante. Habla de adquisición por "compra o expropiación" y prescribe que cuando los terrenos "fuesen adquiridos en esta forma, y los Estados Unidos hayan tomado posesión de los mismos, toda jurisdicción sobre tales terrenos por parte de El Pueblo de Puerto Rico cesará y terminará ipso facto", estando por tanto supeditada la cesación de jurisdicción a la forma de adquisición.

La dificultad en la resolución del caso estriba en que por una parte el destino para el cual se traspasaron los terrenos parece llevar consigo la necesidad de la jurisdicción exclusiva de acuerdo con la política pública proclamada tanto en la cláusula constitucional como en la ley territorial y por otra la fijación expresa del medio de adquisición se opone a la inclusión de otros medios.

Una situación semejante llevó al Juez Robert W. Hughes, juez federal del distrito en Virginia, al resolver el caso de *Crook, Horner & Co.* v. *Old Point Comfort Hotel Co., et al.,* 54 F. 604, 608 a 610, a expresar en su opinión, en parte, lo que sigue:

" . . . No habiendo el Congreso aprobado ninguna legislación para el gobierno, en asuntos civiles, sobre personas que se hallen destacadas permanente o temporalmente en puestos militares, sobre terrenos poseídos por los Estados Unidos, resulta de importancia el dilucidar si los habitantes de Old Point Comfort se hallan sin ley que rija su vida social y civil y sus transacciones de negocios, excepción hecha de la ley según estaba en vigor en Virginia hace más de medio siglo. Se habrá observado de la cláusula de la Constitución que hemos transcrito que su lenguaje expresa que el Congreso tendrá la facultad exclusiva de legislar 'en todos los sitios comprados con el consentimiento de la asamblea legislativa del estado donde los mismos radiquen, para la construcción de fuertes, arsenales,' etc. Estas palabras han sido interpretadas por la Corte Suprema de los Estados Unidos en los casos de *Railroad Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. Rep. 995, y *Railroad Co.* v. *McGlinn,* 114 U. S. 542, 5 Sup. Ct. Rep. 1005, donde se sostuvo que la palabra 'compra' según se usa en la cláusula de la Constitución bajo estudio, no tiene el significado técnico general que posee en el derecho común, de cualquier adquisición de terrenos que no sea por herencia, y sí el único signi-

ficado de una adquisición de tierras por una verdadera compra. Se sostuvo, además, que cuando los Estados Unidos adquieren tierras en cualquier otra forma que no sea mediante tal compra verdad, con el consentimiento del estado, concurriendo una cesión por parte del estado de toda jurisdicción sobre dichas tierras, entonces la cláusula de la Constitución que da al Congreso la facultad exclusiva de legislar y que concede jurisdicción exclusiva a los Estados Unidos, no se aplica. Sostuvo la corte que en esta clase de casos los Estados Unidos toman las tierras sólo bajo tal tenencia (*tenure*) limitada o ilimitada, que el estado confiera por cada estatuto especial de cesión y que tal título debe ser considerado por las cortes como si las tierras hubieran sido cedidas por el estado a un sujeto privado.

"En el caso de *McGlinn,* la Corte Suprema, comentando su decisión del caso de Fort Leavenworth, dijo lo siguiente:

" 'Para que los Estados Unidos tengan la facultad exclusiva de legislar sobre el predio (*tract*) . . . deben haber adquirido el predio por compra, con el consentimiento del estado. Esta es la única forma prescrita por la Constitución federal para la adquisición de poder legislativo exclusivo sobre el mismo. Cuando tal facultad legislativa se adquiere en cualquier otra forma, como por un acto expreso que la cede, la cesión puede ir acompañada de cualquier condición que no sea inconsistente con el uso efectivo de la propiedad para los fines públicos perseguidos. También sostuvimos que la legislatura de un estado puede ceder jurisdicción exclusiva sobre sitios que el gobierno general necesite para la ejecución de sus poderes, siendo el uso de los sitios tanto para los habitantes del estado como para los habitantes de los Estados Unidos en general, y que tal jurisdicción termina necesariamente cuando se deja de usar los sitios para tales fines.'

"No importa cuánto estas decisiones puedan haber afectado las opiniones anteriormente sostenidas por la profesión legal, ellas son la ley suprema de la Nación y deben ser puestas en vigor por las cortes. Una inspección del estatuto de cesión de Virginia, traspasando a los Estados Unidos las tierras de Old Point Comfort, que le pertenecían, y que no fueron compradas por los Estados Unidos, con su consentimiento, de ningún otro dueño, y cediendo la jurisdicción sobre ellas, demostrará que el caso cae dentro de la regla sentada por la Corte Suprema en *Railroad Co.* v. *Lowe* y *Railroad Co.* v. *McGlinn*; y que los Estados Unidos poseen el Fuerte Monroe sin estar sujeto a la cláusula 17, sección 8, artículo 1 de la Constitución, y sí sólo a virtud de la tenencia (*tenure*) provista por el estatuto

de cesión de Virginia de marzo 1, 1821, y la escritura de cesión otorgada por su gobernador en diciembre 12, 1838. Estas actas contienen buen número de vitales limitaciones del poder de los Estados Unidos sobre los terrenos de Old Point Comfort y expresamente proveen la reversión de la tierra a esta comunidad, y su readquisición por ella, en caso de su subsiguiente abandono por parte de los Estados Unidos o si se utilizasen para fines que no fuesen fortificación y defensa nacional.

"  *         *         *         *         *         *         *

"Me parece que resulta evidente de lo que hemos expuesto anteriormente, que la jurisdicción de los Estados Unidos sobre el territorio poseído por ellos en Old Point Comfort no es la jurisdicción absoluta, exclusiva, que confiere la constitución federal sobre sitios comprados con el consentimiento de los estados; y sí la jurisdicción sólo como fué conferida por el estatuto y la escritura de cesión de Virginia. Resulta igualmente evidente que, con excepción de aquellas partes de ese territorio que no estuvieren siendo usadas por el gobierno federal para fines militares, aunque se estuvieren utilizando para otros fines, la jurisdicción del estado es concurrente con la de los Estados Unidos, y que aquellas leyes de Virginia que no sean incompatibles con las de los Estados Unidos que afectan ese territorio, y que no estén en conflicto con el libre uso por parte de los Estados Unidos de aquellas partes del terreno en realidad usadas para fines militares, se hallan en vigor y constituyen la regla de conducta para el gobierno de todos los habitantes de allí que no pertenecen al ejército de Estados Unidos."

La decisión que antecede rendida en 1893 fué citada y aplicada en casos posteriores. Véanse: *Concessions Co.* v. *Morris, Sheriff, et al.,* de la Corte Suprema de Wáshington, año 1919, 186 P. 655, 662 y *State* v. *Bruce,* de la Corte Suprema de Montana, año 1937, 69 P. (2d) 97, 102.

Siendo ésos los hechos y la ley, nos vemos obligados a resolver que el demandado fué debidamente emplazado y que la Corte de Distrito de Bayamón adquirió jurisdicción sobre su persona para seguir conociendo del pleito entablado ante ella por daños y perjuicios ocasionados por actos que tuvieron lugar dentro de su territorio.

La interpretación que damos a la ley de 1903, no es nueva. En el caso del *Pueblo* v. *Suárez,* 51 D.P.R. 903, 910,

dijo esta corte por medio de su Juez Asociado Sr. Travieso:

"La sección 6 de la ley de febrero 16 de 1903, de nuestra Legislatura Insular, tampoco ayuda en nada al apelante en sus esfuerzos para sostener la alegada presunción de jurisdicción exclusiva de la Corte Federal sobre el delito que se le imputa. Por los términos de dicha sección, El Pueblo de Puerto Rico, ajustándose a la doctrina sostenida por la jurisprudencia que hemos citado, cede jurisdicción exclusiva a los Estados Unidos sobre las tierras que el Gobierno Federal pueda en lo sucesivo adquirir en Puerto Rico, *mediante compra o expropiación forzosa.* No basta, pues, que el Gobierno Federal ocupe un edificio con una oficina de correos, para que de esa mera ocupación surja como consecuencia inevitable la jurisdicción exclusiva de los tribunales nacionales. Es necesario que el Gobierno Federal haya comprado o expropiado el edificio. Ese hecho no puede presumirse, debe probarse por el que lo alega. Y una vez probado, la jurisdicción federal queda establecida a virtud de la citada sección de la ley de febrero 16 de 1903.

"La jurisdicción excepcional no se presume nunca. El que la alega debe probarla."

Véase también *West India Oil Co. (P. R)* v. *Sancho Bonet, Tesorero,* 54 D.P.R. 732, 737.

Habiendo llegado a la conclusión que antecede, no es necesario que entremos a considerar en extenso el segundo motivo que tuvo la corte de distrito para declarar sin lugar la moción del demandado, a saber, el no haberse demostrado que los Estados Unidos hubieran aceptado o asumido jurisdicción exclusiva sobre la base. La resolución se sostiene por el primero, pero parece conveniente decir que a virtud del estudio que hemos hecho de la cuestión, nos sentimos inclinados a resolver que en ese respecto nuestro criterio sería contrario al de la corte sentenciadora.

*Debe anularse el auto expedido y devolverse el caso a la corte de distrito de su origen para que continúe conociendo del mismo de acuerdo con la ley.*