EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ELIGIO SUÁREZ, acusado y apelante.

Núm. 6592.—*Sometido:* Junio 22, 1937. *Resuelto:* Julio 13, 1937.

*Abelardo Casanova Prats,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

El Juez Asociado Señor Travieso emitió la opinión del tribunal.

Eligio Suárez fué acusado y convicto de un delito de infracción al artículo 11 de la Ley núm. 67 de 13 de mayo de 1934 (Leyes de 1934, pág. 459), titulada "Ley para reglamentar la manufactura, posesión, almacenaje, transporte, venta o donación de explosivos en Puerto Rico, definiendo los delitos, estableciendo penas, declarando una emergencia, y para otros fines." El delito imputádole se describe así en la acusación:

"El referido acusado Eligio Suárez, allá para uno de los días del mes de julio de 1935 y en la municipalidad de San Juan, Puerto Rico, que forma parte del distrito judicial del mismo nombre, ilegalmente usó dinamita y otro explosivo desconocido para el fiscal que suscribe, con el propósito de hacer daño y destruir el edificio que ocupa la oficina del correo de Puerta de Tierra."

No conforme con la pena de tres años de cárcel con trabajos forzados que le fué impuesta, el acusado interpuso el

presente recurso. Y para sostenerlo imputa a la corte sentenciadora la comisión de once errores. Precederemos a considerarlos en el mismo orden en que han sido formulados.

1. Que la Corte de Distrito de San Juan erró al asumir jurisdicción para conocer del caso.

Arguye el apelante que la jurisdicción en este caso corresponde exclusivamente a la Corte de Distrito de los Estados Unidos para Puerto Rico, por tratarse de un edificio de correo federal; que aun cuando las cortes insulares tuvieran jurisdicción sobre estos casos, de la prueba no aparece que el alegado delito fuera cometido dentro de la jurisdicción de la Corte de Distrito de San Juan; y que la ley bajo la cual se ha formulado la acusación es anticonstitucional porque contiene más de un asunto bajo un mismo título.

■■ La prueba ofrecida por El Pueblo dejó establecido fuera de toda duda que "el edificio que ocupa la oficina de correos de Puerta de Tierra", o sea el sitio donde ocurrieron los hechos delictivos que se imputan al acusado, está ubicado en la parada 5½, en la esquina de la Avenida Ponce de León y la calle "Padre Hoff", en el Barrio de Puerta de Tierra. Esta corte tiene conocimiento judicial de que el barrio de Puerta de Tierra está comprendido dentro de los límites jurisdiccionales de la Corte de Distrito de San Juan.

■■ El estatuto (Ley núm. 67 de 1934) define el delito que se imputa al apelante así:

"Artículo 11.—*Uso Ilegal.*—*Castigos.*—Toda persona que use dinamita u otro explosivo ilegalmente con el propósito de hacer daño corporal, o de aterrorizar o asustar a cualquier persona, o para hacer daño o destruir cualquier propiedad, o para hacer daño a la misma en cualquier forma, podrá ser castigada, etc."

La acusación en el caso de autos se ajusta al lenguaje del estatuto y es suficiente para informar al acusado sobre la naturaleza del delito que se le imputa. Las palabras "el edificio que ocupa la oficina de correos de Puerta de Tierra" no imputan al acusado la comisión de un delito federal.

Esas palabras han sido insertadas en la acusación para describir e identificar mejor la propiedad que se alega el acusado trató de destruir ilegalmente. La acusación sería igualmente suficiente si imputase al acusado el propósito de destruir ''el edificio situado en la esquina de la Avenida Ponce de León y de la calle Padre Hoff.'' Todo lo que requiere el estatuto es que se use el explosivo con el propósito de hacer daño o destruir una propiedad, no importa quién pueda ser su dueño. Si el acusado levanta la cuestión jurisdiccional, alegando que la propiedad que se ha tratado de destruir pertenece al Pueblo de los Estados Unidos y que por consiguiente la Corte Federal tiene jurisdicción exclusiva sobre el caso, es a él a quien incumbe sostener tal alegación.

■■ Dice el apelante en su alegato: ''Se ha resuelto por las Cortes de Estados Unidos que se presume que cuando el Gobierno Federal ocupa tierras o edificios para fines gubernamentales, tales tierras y edificios son propiedad del Gobierno Federal, y por lo tanto, es exclusiva la jurisdicción de las Cortes Federales.'' Pero no nos ayuda el apelante señalándonos las fuentes de su información, pues no cita ni una sola autoridad que sostenga tal doctrina. Y aunque hemos hecho un cuidadoso estudio de la jurisprudencia federal sobre la materia, no hemos podido encontrar base para sostenerla.

Los estados—y El Pueblo de Puerto Rico por virtud de su Carta Orgánica—tienen jurisdicción exclusiva para conocer de y castigar todos aquellos delitos que fueren cometidos dentro de sus límites territoriales. Esa es la regla general de jurisdicción. Y se funda, naturalmente, en que los estados son soberanos, con todos los poderes inherentes a la soberanía, mientras el Gobierno Federal es un gobierno de poderes delegados, que puede ejercer solamente aquéllos que le hayan sido cedidos por los estados. La excepción a la regla general es la que establece la Constitución Federal (Art. 1, Sección 8, cláusula 17) al conceder al Congreso el poder legislativo exclusivo sobre todos aquellos locales (*places*) com-

prados con el consentimiento de la Legislatura del Estado en que radicaren para la construcción de fuertes, almacenes, arsenales, y otros edificios necesarios. Cuando el Gobierno Federal compra terrenos para cualesquiera de los indicados fines y la legislatura estadual da su consentimiento, los terrenos así comprados quedan *ipso facto* sometidos a la jurisdicción exclusiva del Congreso y la jurisdicción del estado cesa por completo. Véase *U. S.* v. *Cornell* (C.C.R.I. 1819) 2 Mason 60, 25 Fed. Cases núm. 14867.

La jurisprudencia que hemos examinado sostiene:

"Un estado conserva completa y exclusiva jurisdicción política sobre terrenos comprados por los Estados Unidos sin el consentimiento del estado o cuando la jurisdicción política sobre dichos terrenos no ha sido cedida en alguna otra forma a los Estados Unidos por el Estado."

*U. S.* v. *San Francisco Bridge Co.*, 88 F. 891.

En el caso de *U. S.* v. *Penn*, 48 Fed. 669, los Estados Unidos habían comprado los terrenos de Arlington, durante la guerra, en una subasta por falta de pago de contribuciones. El Estado de Virginia nunca cedió su jurisdicción sobre dicha propiedad. Y se sostuvo que la Corte Federal no tenía jurisdicción sobre un delito de hurto menor cometido en el Cementerio Nacional en aquel estado.

En *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, 531, 29 L. Ed. 264, al sostener que el estado de Kansas no había perdido su jurisdicción sobre la Reserva Militar de Fort Leavenworth, la Corte Suprema Federal dijo:

"El consentimiento de los estados para la compra de terrenos dentro de sus límites para los propósitos especiales mencionados es esencial, de acuerdo con la Constitución, para transferir al Gobierno Federal, junto con el título, la jurisdicción política y el dominio. Cuando las tierras son adquiridas sin tal consentimiento, la posesión de los Estados Unidos, a menos que la jurisdicción política le haya sido cedida en alguna otra forma, es simplemente la de un propietario ordinario. La propiedad en ese caso, a menos que sea usada para llevar a cabo los propósitos del gobierno, está sujeta a la auto-

ridad legislativa y al control de los estados al igual que la propiedad de ciudadanos privados.''

Véanse también: *U. S.* v. *Cornell,* supra; *Commonwealth* v. *Clary,* 8 Mass. 72; *In re Kelly,* 71 Fed. 545, y casos citados en U.S.C.A., Constitution, págs. 440–448.

En *Fort Leavenworth R. R. Co.* v. *Lowe,* supra, dijo también el Tribunal Supremo Federal:

''Por consiguiente, cuando los Estados Unidos han adquirido terrenos dentro de los límites de un estado, en cualquier otra forma que no sea por compra con el consentimiento del estado, el Gobierno Federal poseerá los terrenos sujetos a la siguiente condición: que si sobre ellos se construyen fuertes, arsenales u otros edificios públicos para los usos generales del Gobierno Federal, tales edificios, con sus pertenencias, como instrumentos para el ejercicio de sus poderes, estarán libres de aquella intervención y jurisdicción del estado que pudiera destruir o disminuir su uso efectivo para los fines indicados. Tal es la ley con referencia a todas las instrumentalidades creadas por el Gobierno General. Su exención del control del estado es esencial a la independencia y autoridad soberana de los Estados Unidos dentro de la esfera de sus poderes delegados. Pero cuando no son usados como tales instrumentalidades, el poder legislativo del Estado sobre los locales adquiridos será tan completo como sobre cualquiera otra propiedad dentro de sus límites.''

El caso de *Battle* v. *United States,* 209 U. S. 36, 52 L. Ed. 670, citado por el apelante, no es una autoridad para sostener su teoría de que cuando el Gobierno Federal ocupa un edificio para el servicio de correo debe presumirse que ese edificio es propiedad de dicho Gobierno, y, por lo tanto, que la jurisdicción de las cortes federales es exclusiva. En el citado caso se trataba de un asesinato cometido *sobre terrenos comprados por los Estados Unidos,* en la ciudad de Macon, Estado de Georgia, en los que se había construído un edificio para correo y corte de justicia y *sobre los cuales el Estado de Georgia había cedido su jurisdicción.* La única cuestión que se debatió en el caso fué si el Congreso tenía poder para comprar terrenos para correos y cortes. Y esa cuestión quedó resuelta así:

"No puede haber duda en cuanto al poder del Congreso para comprar tierras dentro de un estado para correos o cortes, con el consentimiento de la legislatura del estado, y para ejercer el poder exclusivo de legislar sobre esas tierras. Los edificios de correos figuran entre los otros edificios necesarios (*other needful buildings*) para la construcción de los cuales, lo mismo que para la de fuertes, almacenes y arsenales, *se asume que se comprarán terrenos,* y para los cuales se han comprado terrenos por el Gobierno de los Estados Unidos." (Itálicas nuestras).

La sección 6 de la ley de febrero 16 de 1903, de nuestra Legislatura Insular, tampoco ayuda en nada al apelante en sus esfuerzos para sostener la alegada presunción de jurisdicción exclusiva de la Corte Federal sobre el delito que se le imputa. Por los términos de dicha sección, El Pueblo de Puerto Rico, ajustándose a la doctrina sostenida por la jurisprudencia que hemos citado, cede jurisdicción exclusiva a los Estados Unidos sobre las tierras que el Gobierno Federal pueda en lo sucesivo adquirir en Puerto Rico, *mediante compra o expropiación forzosa.* No basta, pues, que el Gobierno Federal ocupe un edificio con una oficina de correos, para que de esa mera ocupación surja como consecuencia inevitable la jurisdicción exclusiva de los tribunales nacionales. Es necesario que el Gobierno Federal haya comprado o expropiado el edificio. Ese hecho no puede presumirse, debe probarse por el que lo alega. Y una vez probado, la jurisdicción federal queda establecida a virtud de la citada sección de la ley de febrero 16 de 1903.

La jurisdicción excepcional no se presume nunca. El que la alega debe probarla. En el caso de autos el fiscal alegó que el delito había sido cometido en la Municipalidad de San Juan, Puerto Rico, que forma parte del Distrito Judicial de San Juan. Y la prueba demuestra que el edificio que se trató de dañar o destruir radica dentro de esa jurisdicción. No existiendo presunción legal alguna a favor de la jurisdicción federal invocada por el apelante, por el mero hecho de que en el edificio estuviese instalada una oficina de correos, el fiscal no estaba obligado a probar la negativa o sea que el

edificio no era propiedad de los Estados Unidos, por compra o expropiación. Era al acusado a quien incumbía probar su afirmación, demostrando que el caso está comprendido, por excepción, dentro de la jurisdicción federal. Del récord no aparece que el acusado presentara prueba alguna tendiente a sostener su alegación. Véanse: *People* v. *Collins,* 105 Cal. 504; *People* v. *Fredericks,* 106 Cal. 554; *United States* v. *Jones,* 109 U. S. 513.

No erró la corte inferior al asumir jurisdicción.

■ 2. Que la corte inferior erró al no resolver que los hechos alegados en la acusación no constituyen delito público alguno, por ser anticonstitucional y nula la Ley Núm. 67 de 13 de mayo de 1934, especialmente en su Artículo 11.

Se alega como motivo de anticonstitucionalidad que el título de dicha ley no incluye el "uso" ilegal de explosivos, que castiga en su artículo 11, violando así el artículo 34 de nuestra Carta Orgánica, que dispone que "no se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título."

En *Cepeda* v. *Lugo, Alcaide,* 50 D.P.R. 379, se planteó la misma cuestión que aquí plantea el apelante, y la resolvimos sosteniendo que al usar la palabra "posesión" en el título de la ley la legislatura había tenido la intención de incluir en ella el "uso."

Arguye el apelante, para destruir el efecto de la citada decisión, que no fué la intención de la Legislatura incluir "uso" cuando hablaba de "posesión." Y en apoyo de su contención aduce el hecho de que en mayo 9 de 1936, la misma legislatura aprobó la Ley núm. 66 titulada "Ley para enmendar, con el fin de conformarle con el artículo 11, el Título de la Ley núm. 67 aprobada en marzo 13, 1934, y para otros fines", cuya sección primera lee así:

"Sección 1.—Que el título de la Ley Número 67 aprobada en marzo 13, 1934, queda por la presente enmendado en la forma siguiente: 'Para reglamentar la manufactura, uso, posesión, almace-

naje, transporte, venta o donación de explosivos en Puerto Rico, definiendo los delitos, estableciendo penas, declarando una emergencia; y para otros fines.' '' (L. 1936, p. 343.)

Y sigue arguyendo el apelante que la aprobación de la citada enmienda demuestra "que la intención original de la legislatura no fué incluir la palabra 'uso' ni darle el significado de 'uso' a la palabra 'posesión' que usa en el título de la ley;" y que "hay que llegar a la conclusión inevitable de que la legislatura ha interpretado su intención en la misma forma en que la plantearon los apelantes en el caso de referencia (*Cepeda* v. *Lugo,* supra), y no en la forma en que la interpretara este Honorable Tribunal." En otras palabras, el apelante sostiene que la Legislatura, invadiendo el campo del Poder Judicial, ha revocado la decisión de este tribunal.

La argumentación del apelante es hábil pero no convincente. No estamos autorizados para presumir que la Legislatura haya tenido la intención que le atribuye el apelante. Para aceptar esa presunción tendríamos que aceptar primero que la legislatura no tuvo, hasta que aprobó la Ley núm. 66 de 1936, la intención de castigar el uso de explosivos para destruir o hacer daño a la propiedad. A nuestro juicio, el propósito de la Legislatura al aprobar la mencionada ley fué el de conformar su legislación a la interpretación judicial, evitando así que en el futuro pudieran suscitarse dudas en cuanto a la intención legislativa. Opinamos que la ley de cuya infracción se acusa al apelante es válida y constitucional y que la corte inferior no erró al sostener su validez.

 3. Que la corte inferior erró al declarar sin lugar la excepción perentoria sobre insuficiencia y ambigüedad de la acusación.

Ya hemos resuelto, al discutir los errores anteriores, que la acusación se ajusta al estatuto y contiene todos los elementos necesarios para informar al acusado en cuanto a la naturaleza del delito que se le imputa.

Alega el apelante que la acusación es ambigua porque dice que el acusado usó dinamita y "otro explosivo descono-

cido para el fiscal''; y que como la ley castiga el uso de ciertos explosivos y no castiga el de otros, la alegación resulta ambigua porque no se sabe si el explosivo desconocido por el fiscal es uno de los castigados o uno de los no castigados por la ley.

De la transcripción de autos aparece que al serle leída la acusación el acusado hizo alegación de inocente, sin formular excepción alguna en contra de la acusación, quedando así el caso listo para juicio. El día 17 de abril de 1936, al ser llamado el caso para juicio, el acusado radicó excepción perentoria a la denuncia y alegó:

"Que los hechos alegados en la acusación son insuficientes y ambiguos y no determinan delito público alguno."

Ni en el escrito radicado por el apelante, ni en ninguna parte del récord aparece que el acusado hiciera una especificación de la alegada ambigüedad de la acusación. Sí aparece del récord que la excepción perentoria fué sometida sin argumentación. La corte no tuvo una oportunidad de conocer en qué consistía la alegada ambigüedad.

Somos de opinión que la excepción por ambigüedad fué interpuesta tardíamente. El acusado debió formularla antes de contestar la acusación o por lo menos en cualquier fecha anterior a la señalada para el juicio, para dar una oportunidad al fiscal de explicar o enmendar cualquier ambigüedad que pudiera haber en la acusación. Y debió además hacer constar específicamente la alegada ambigüedad, que ahora señala por primera vez en apelación.

Entendemos además que no existe tal ambigüedad. La acusación imputa al acusado el uso de dinamita, explosivo cuyo uso está castigado por la ley. Las palabras "y otro explosivo desconocido para el fiscal" no eran absolutamente necesarias para completar la descripción del delito, y pueden ser consideradas como superfluas (*surplusage*). Si el fiscal desconocía el otro explosivo, no podría exigírsele que lo especificara en la acusación y habría que presumir que ese explosivo era de los no castigados por la ley.

No cometió la corte el error que se le imputa.

■ 4. Que la córte sentenciadora erró al admitir evidencia oral para probar que el edificio es propiedad de una persona particular y está arrendado al correo por dicha persona, cuando ese hecho debió probarse con la mejor prueba, que es la documental.

El alegado error carece de importancia. Y si alguno se hubiere cometido, en nada pudo perjudicar los derechos del acusado. El delito que se imputó a éste fué el de usar explosivos para destruir o causar daño a una propiedad situada dentro de la jurisdicción de la corte. El fiscal no estaba obligado a probar quién era el dueño del edificio, por ser ése un hecho inmaterial y no un elemento necesario para sostener la acusación. Si al acusado le interesaba probar que el edificio era propiedad de los Estados Unidos, a los efectos de sostener su excepción de falta de jurisdicción, amplia oportunidad tuvo para probarlo y no lo hizo.

■ 5. Que la corte inferior erró al negarse a eliminar del récord la conclusión del testigo Juan Igaravidez de que había estallado una bomba en Puerta de Tierra.

Después de haber declarado dicho testigo que conocía de vista al acusado y que lo había visto tres veces, el interrogatorio por el fiscal siguió así:

"P. ¿Qué noche lo vió?

"R. La noche en que estalló la bomba en Puerta de Tierra.

"P. ¿En qué parte de Puerta de Tierra?

"R. Al salir del correo.

"Defensa: Que se elimine eso de la bomba.

"Juez: No estamos ante un jurado.

"Defensa: Excepción.

"P. ¿Cómo sabe que sonó una bomba?

"R. Porque cuando bajaba por el callejón, cuando venía por la Francesa, sentí el estruendo.

"P. ¿Qué sintió?

"R. Vi que estalló.

"P. ¿Que estalló qué?

"R. Un estruendo grande.

"P. ¿Desde dónde vió eso?

"R. Venía doblando de la Francesa y doblaba por el Padre Hoff, para San Agustín 48, en que yo vivía."

No hubo error en permitir el interrogatorio que precede. El testigo no estaba dando su opinión sobre si la explosión había sido causada por una bomba o no. Si habló de bomba fué para precisar la noche en que había visto al acusado. Fué un testigo presencial del hecho de haber ocurrido una explosión y la corte estuvo justificada en permitirle relatar los hechos percibidos por él. En nada pudieron perjudicarse los derechos substanciales del acusado, especialmente como hizo constar la corte, tratándose de un juicio ante tribunal de derecho. El mismo abogado defensor al repreguntar a los testigos de cargo y al examinar los de descargo en varias ocasiones les preguntó dónde estaban cuando estalló ''la bomba'' o cuando sonó la ''explosión''. Y debemos presumir que no lo hacía con la intención de perjudicar a su defendido.

■■■ 6, 7, 8 y 9. Todos estos señalamientos se refieren a la alegada insuficiencia de la evidencia, imputando a la corte el error de haber declarado sin lugar la moción para la absolución perentoria del acusado.

Hemos estudiado cuidadosamente la transcripción de evidencia y las conclusiones de hecho a que llegó la corte sentenciadora, y encontramos que las últimas están ampliamente sostenidas por la prueba. No existen conflictos entre los testigos de cargo, los cuales se corroboran por completo unos a otros. La evidencia presenta conflictos entre los testigos de cargo y los de la defensa, pues mientras los primeros declaran sobre la presencia del acusado en el sitio en que ocurrió y en el momento de ocurrir la explosión, los otros tratan de sostener la defensa de coartada que presenta el acusado y declaran que el acusado se encontraba en otro sitio en aquel momento. Es la corte sentenciadora, ante la cual comparecen y deponen los testigos, la que está investida de facultades para pesar la prueba, juzgar sobre la credibilidad de los testigos y resolver los conflictos que puedan surgir de sus declaraciones. No puede la corte de apelación intervenir con la discreción judicial de la corte inferior, a menos que ésta

hubiese incurrido en manifiesto error o hubiese actuado apasionadamente o movida por parcialidad o prejuicio al apreciar la evidencia. Y el apelante no ha hecho tales imputaciones.

La identificación del acusado como autor del atentado quedó establecida por las declaraciones de dos testigos, el policía Arístides Ferrer y el paisano Juan Igaravídez, quienes identificaron al acusado como la persona a quien habían visto salir corriendo del edificio y subirse al estribo de un automóvil que venía lentamente por la carretera, en el momento en que ocurrió la explosión.

La defensa interpuesta por el acusado era la de coartada, *alibi*, o sea que el acusado se encontraba en un sitio distinto al en que se cometió el delito, en el momento en que el delito fué cometido. Para que la defensa de coartada pueda ser efectiva, o por lo menos suficiente para que pueda crear en la mente del juzgador una duda razonable en cuanto a la culpabilidad del acusado, es necesario que la evidencia presentada para sostenerla excluya la posibilidad de que el acusado estuviera presente en el sitio en que se cometió el delito, en el momento de su comisión. Examinemos la prueba.

La evidencia, considerada en conjunto, fija el momento en que ocurrió la explosión entre las 12 y 12.10 de la noche del 25 al 26 de julio de 1935. Para sostener su coartada el acusado presentó la prueba siguiente:

Casimiro Rodríguez, quien declaró que la noche del 25 de julio fué a visitar al licenciado Casanova en su casa en la Plaza de Colón, de San Juan; que al pasar por la Plaza Baldorioty encontró a Ramón Jaime Santana y a su hermano el Licenciado Santana y todos juntos fueron a visitar a Casanova; que él, el testigo, se retiró como a las 10.30 ó 10.35 P. M., dejando allí al acusado.

Ramón Jaime Santana, corrobora la declaración de Casimiro Rodríguez, y declara que la visita a Casanova terminó como a las 11 u 11.05 P. M. y que él se separó del acusado Suárez, en la calle San José, como a las 11.30 P. M.

El Licenciado Casanova Prats, abogado defensor del acusado, declaró: "Como a las diez y media u once menos cuarto, una cosa así, más o menos, creo no llegaba a las once de la noche, se retiraron ellos de mi casa," refiriéndose al acusado y a los hermanos Santana: que ellos, regularmente, había veces salían de su casa a las once y media y hasta las doce de la noche, pero esa noche insistieron en irse más temprano. Y al preguntarle el juez a qué hora se fueron, contestó: "Poco más o menos de 10.30 a 11 de la noche; más bien entre ese tiempo, como a las once menos cuarto."

Como se ve las anteriores declaraciones no destruyen la posibilidad de que el acusado estuviera en el sitio y en el momento de la explosión. Aun cuando el juez sentenciador hubiese dado entero crédito a dichas declaraciones, siempre era posible que el acusado estuviese a las 10.35 en casa de Casanova, donde dice Rodríguez que le dejó, o a las 11.30 en la calle San José, donde Santana le dejara, o a las 10.45 saliendo de casa de Casanova, según declaró éste; y que a pesar de todo eso estuviera en el sitio del crimen a las 12 ó 12.10 de esa misma noche. Aceptando como absolutamente verídicas esas tres declaraciones, ninguna de ellas nos dice dónde estaba el acusado durante el tiempo que hubo de transcurrir desde las 11.30 cuando se separó en la calle San José de los hermanos Santana y las 12 o 12.10, hora en que estalló la bomba. Y ese lapso de tiempo era más que suficiente para que el acusado pudiese ir desde San Juan a Puerta de Tierra, cometer el delito que se le imputa y regresar al punto de partida, pues según la declaración de uno de los testigos de la defensa (Página 60 T. de E.) para ir en automóvil, a 30 millas por hora, a altas horas de la noche cuando hay poco tráfico, desde la Parada 5 ó 7 de Puerta de Tierra al Garage Las Monjas en San Juan se invierten unos cinco minutos.

Para completar la prueba de su coartada presentó la defensa dos testigos más, quienes declararon:

José López Cepero: que estaba en su casa cuando sonó la bomba; que poco antes, como tres o cuatro minutos antes,

había salido del garage Las Monjas, donde fué a guardar un carro; que vió en el garage al acusado, como a las doce menos tres minutos; que se fué a su casa a las doce menos dos minutos, tardando en llegar a ella tres o cuatro minutos, y que en el momento en que abría la puerta de entrada ocurrió la explosión.

Rafael López: que es amigo íntimo del acusado; que trabaja en el garage "Las Monjas"; que en el momento en que reventó la bomba el acusado estaba en el garage hablando con él; que el acusado estuvo allí desde las 11 de esa noche hasta después de ocurrida la explosión, hasta las 12.15.

Es de notarse el conflicto que existe entre la declaración de este último testigo y la del testigo Santana. Éste declaró positivamente que él, su hermano y el acusado salieron de casa del Lic. Casanova a las once y pico; y que se separó del acusado "Serían las once y media, una cosa así." ¿Cómo es posible, a menos que posea el don de la ubicuidad, que el acusado estuviera en el garage Las Monjas, hablando con su amigo Rafael López desde las 11 hasta las 12.15, y que a las 11.30 estuviera en la calle San José con los hermanos Santana?

Los testigos de *rebuttal,* Gutiérrez y Villanueva, declararon haber estado en el garage inmediatamente después de oír la explosión y que el acusado no estaba allí como aseguran los testigos de defensa; y que el único que estaba allí era el *watchman* Rafael López, hablando con otro que no era el acusado.

La corte sentenciadora, después de hacer un resumen de la prueba, se expresó así:

". . . En este caso, después de ver y oír declarar los testigos, comparar y analizar sus declaraciones y considerar el interés o prejuicio que pudieren tener los testigos al declarar en la forma en que lo hicieron y considerando además que la duda razonable no debe ser una duda caprichosa, ni fingida o imaginada por el juzgador con el fin de evadir la responsabilidad de impartir justicia, tenemos la convicción o certeza moral de que la culpabilidad del acusado ha sido probada más allá de toda duda razonable."

El récord justifica las conclusiones a que llegó el juzgador y no nos creemos autorizados para modificarlas.

██ Se queja el apelante en su décimo señalamiento de que la pena de tres años de cárcel que le ha sido impuesta es excesiva. No lo es a nuestro juicio. Si algún delito merece la aplicación de una pena severa es el de usar explosivos para aterrorizar a toda una comunidad, poniendo en peligro la vida de personas inocentes. No importa cuál pueda ser el móvil personal o político que se persiga con tan cobardes atentados, el autor de ellos es merecedor de una severa pena. No puede quejarse el apelante en este caso de una pena que consideramos excesivamente benigna.

*La sentencia debe ser confirmada.*

El Juez Asociado Señor Córdova Dávila no intervino.