Urgell Cuebas, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
El apelante, Señor Edgardo Mulero Santana, presentó recurso de apelación para revisar una sentencia dictada en su contra por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 23 de agosto de 1995. Mediante la misma se le declaró convicto por violación al Art. 166 del Codigo Penal, 33 L.P.R.A. 4272, consistente en el delito de apropiación ilegal agravada. A tenor con la sentencia, se le impuso al apelante la pena de seis (6) años de prisión, bajo el régimen de sentencias suspendidas.
Aduce el apelante que el tribunal a quo no tenía jurisdicción para enjuiciarlo ya que los hechos imputados ocurrieron mientras se desempeñaba como oficial de ventanilla del Servicio Postal de los Estados Unidos. Además, sostiene que la prueba fue insuficiente en derecho para establecer su culpabilidad.
Considerada la exposición narrativa de la prueba y los alegatos de las partes, procedemos a confirmar la sentencia recurrida.
I
El Ministerio Público formuló acusación contra el apelante, Sr. Edgardo Mulero Santana, por violación al Art. 166 del Código Penal, 33 L.R.P.A. 4272. En la acusación se alegó que el apelante, para el 24 de diciembre de 1992 se apropió de cuatrocientos cuarenta dólares con veinte centavos, ($440.20), del producto del giro postal 4781277998, expedido por la cantidad de quinientos dólares, ($500), perteneciente al Servicio Postal de los Estados Unidos de America.
Para la fecha de los hechos, el apelante se desempeñaba como oficial de ventanilla del Servicio Postal de los Estados Unidos en la oficina de correos ubicada en la Avenida 65 de Infantería. El 22 de diciembre de 1992, el apelante recibió de su supervisor, Sr. Angel Luis Coira, dos (2) paquetes de giros postales, los cuales contenían cien (100) giros cada uno, para un total de doscientos (200) giros. Los mismos estaban numerados y debían ser vendidos en secuencia numérica. 
El 24 de diciembre de 1992 el apelante vendió el giro postal 4781277998, (número 998), por la cantidad de quinientos dólares, ($500), fuera de secuencia numérica, al Sr. Manuel Vicente Paganacci. Este giro no apareció en la lista de los que fueron vendidos ese día. El supervisor del apelante no se percató que el mismo no aparecía en el listado de los giros vendidos, pues la lista terminó con el giro 785. El giro antes mencionado fue incluido *624 por el apelante dentro del listado de los giros vendidos correspondientes al día 25 de enero de 1993. Este le informó a su supervisor que había perdido el "voucher" (copia del giro), por lo cual se procedió a hacer un facsímil del giro por la cantidad de cincuenta y nueve dólares con ochenta centavos ($59.80).
Posteriormente, la Oficina del Centro de Giros Postales en San Luis, Missouri, emitió un listado que indicaba que el giro había sido pasado por el Banco de la Reserva Federal el 29 de diciembre de 1992, pero que había sido emitido el 25 de enero de 1993. Según el listado, el giro había pasado por el banco un mes antes de ser vendido. Esta anomalía motivó que se iniciara una investigación, la cual estuvo a cargo del Inspector Postal, Sr. Dater Tanner Soler. De ésta surgió que ese giro en particular estaba consignado en el listado de giros vendidos del empleado Sr. Edgardo Mulero, correspondiente al 25 de enero de 1993, por la cantidad de $59.80. Al examinarse los "vouchers" se encontró que el entregado por el apelante no era el original, sino un facsímil completado a mano y fechado 25 de enero de 1993. Además, el Sr. Tanner ya había recibido el giro que fue cambiado y sabía que éste era por la cantidad de $500.00, con fecha de 24 de diciembre de 1992. El Sr. Tanner también entrevistó al Sr. Paganacci, quien fue la persona que compró el giro el 24 de diciembre de 1992, confirmando que esa era la fecha en que éste lo había adquirido. En resumen, la investigación arrojó que el giro se vendió en una fecha anterior a la fecha en que el apelante entregó el "voucher" y, además, que fue vendido por una cantidad mayor de la indicada en el "voucher".
Luego de recopilar la evidencia, el Sr. Tanner se comunicó con el agente Pereira del C.I.C. y presentó la querella sobre el incidente.
El apelante renunció a su derecho de juicio por jurado y fue juzgado y convicto por tribunal de derecho. En el juicio declararon como testigos de cargo el Sr. Manuel Vicente Paganacci, quien compró el giro; el Sr. Angel Luis Coira Zayas, Gerente de la sucursal de la 65 de Infantería; y el Sr. Dater Tanner Soler. Como testigos de defensa declararon el Sr. Rafael de Jesús, Gerente del Correo General de Hato Rey; el Sr. Rigoberto Rodríguez, empleado del Departamento de Finanzas del Correo; el Dr. José Domingo Torres Rodríguez; y el propio apelante.
Antes de ser sentenciado, el apelante solicitó que se dejara sin efecto el fallo y se desestimara la acusación bajo el fundamento de que el tribunal recurrido carecía de jurisdicción para juzgarle. La moción fue declarada sin lugar, luego de lo cual el juez que presidió la vista procedió a dictar sentencia e imponerle una pena de seis (6) años de prisión, bajo el régimen de sentencias suspendidas. '
No conforme con dicho dictamen, el apelante presentó recurso de apelación ante este Foro, señalando que se cometieron los siguientes dos (2) errores:

"Incidió el Honorable Tribunal al asumir jurisdicción en el presente caso y posteriormente al declarar sin lugar la MOCION AL AMPARO DE LA REGLA 64(B) DE PROCEDIMIENTO CRIMINAL, en la que se solicitaba que se anulara el fallo y se desestimara la acusación por carecer el Tribunal de jurisdicción para procesar al apelante por los hechos que se le imputaban.

Incidió el Honorable Tribunal al no conceder el beneficio de la duda razonable al apelante optando por declararlo culpable de infracción al Artículo. 166 del Código Penal de Puerto Rico a base de prueba inconsistente e insuficiente en derecho para establecer su culpabilidad."
n
En su alegato el apelante presenta dos planteamientos para impugnar la jurisdicción del tribunal apelado. Ataca la jurisdicción con respecto al área geográfica en la que ocurrieron los hechos, aduciendo que ésta es uno de los enclaves federales que están excluidos de la jurisdicción de los tribunales del Estado Libre Asociado. Además, ataca la jurisdicción sobre la materia, argumentando que existe campo ocupado debido a la existencia de una legislación federal abarcadora que precluye a la local.
La jurisdicción territorial de los tribunales del Estado Libre Asociado de Puerto Rico en el área penal está definida en los Arts. 2 y 3 del Código Penal, 33 L.P.R.A. sees. 3002 y 3003. En lo pertinente, éstos disponen *625 como sigue:

"3002. Aplicación territorial de la Ley Penal

Este Subtítulo y el Subtítulo 3 se aplicarán por delito consumado o intentado:

(a) En la extensión territorial del Estado Libre Asociado de Puerto Rico; o

(b).
(c).

3003. Definición de extensión territorial

Se entiende por extensión territorial el espacio de tierra, mar y aire sujeto a la jurisdicción del Estado Libre Asociado de Puerto Rico."

El delito imputado en el caso de autos ocurrió en un correo de los Estados Unidos, por lo que el apelante alega que existe jurisdicción exclusiva de la Corte de Distrito Federal para el Distrito de Puerto Rico. Un planteamiento similar fue presentado en Pueblo v. Suárez, 51 D.P.R. 903 (1937), en el cual se le imputaba al acusado la destrucción de un edificio de correo federal por medio de la colocación de una bomba explosiva en éste. Al considerar el aspecto de la jurisdicción territorial respecto al edificio de correo federal el Tribunal Supremo, a la pág. 907, se expresó así:
"Los estados —y El Pueblo de Puerto Rico por virtud de su Carta Orgánica— tienen jurisdicción exclusiva para conocer de y castigar todos aquellos delitos que fueren cometidos dentro de sus límites territoriales. Esa es la regla general de jurisdicción. Y se funda, naturalmente en que los estados son soberanos, con todos los poderes inherentes a la soberanía, mientras que el Gobierno Federal es un gobierno de poderes delegados, que puede ejercer solamente aquellos que le hayan sido cedidos por los estados. La excepción a la regla general es la que establece la Constitución Federal (Art. 1, Sección 8, cláusula 17) ...".
La mencionada sección de la Constitución Federal, 1 L.P.R.A. Constitución de los E.U.A. Art. 1, § 8, el. 17, dispone en lo pertinente como sigue:

"El Congreso tendrá facultad.....

Para ejercer el derecho exclusivo a legislar en todas las materias concernientes a aquel distrito (cuya superficie no excederá de diez millas en cuadro) que, por cesión de algunos estados y aceptación del Congreso, se convirtiere en la sede del Gobierno de los Estados Unidos; y para ejercer igual autoridad sobre todas aquellas tierras adquiridas con el consentimiento de la Asamblea Legislativa del estado en que radicaren, con elfin de construir fuertes, almacenes, arsenales, astilleros y otras edificaciones que fueren necesarias ..." (Enfasis suplido.)
Los estatutos federales que reglamentan la existencia y el ejercicio de la jurisdicción federal sobre territorios adquiridos por el gobierno federal con el propósito de construir "otras edificaciones que fueren necesarias", tales como correos, están codificados en 18 U.S.C.A. § 7 y 40 U.S.C.A. § 255. En lo pertinente éstos disponen como sigue:

"§ 7. Special maritime and territorial jurisdiction of the United States defined 

The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:

(3) Any lands reserved or acquired for the use of the United States and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the 
*626
legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

§ 255 Approval of title prior to Federal land purchases; payment of title expenses; application to Tennessee Valley Authority: Federal jurisdiction over acquisitions. 

Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter, be acquired shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which lands or interests therein under his immediate jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted." (Enfasis suplido.)
En concordancia con las disposiciones federales citadas, la legislatura de Puerto Rico aprobó la Ley Núm. 62 del 10 de junio de 1955, 28 L.P.R.A. sees. 54 a 57, la cual define los procedimientos a seguirse cuando el gobierno federal desea obtener jurisdicción exclusiva sobre terrenos adquiridos por éste. Los primeros dos artículos de esta ley disponen:

"§ 54. Adquisición de terrenos por los Estados Unidos - Consentimiento; jurisdicción

Por la presente se da el consentimiento a Estados Unidos para adquirir, para fines navales o militares u otros fines públicos, mediante compra, cesión, donación, permuta, arrendamiento, expropiación forzosa o en otra forma, cualesquiera terrenos en el Estado Libre Asociado de Puerto Rico pertenecientes a individuos, sociedades, corporaciones, municipios y agencias o dependencias gubernamentales, pero la jurisdicción sobre dichos terrenos permanecerá en el Estado Libre Asociado de Puerto Rico salvo que la misma sea cedida a Estados Unidos en la forma en que se provee más adelante.

"§ 55. Cesión de jurisdicción a los Estados Unidos; aceptación

Una vez Estados Unidos haya adquirido y tomado posesión de los terrenos, y previa solicitud de un funcionario autorizado del Gobierno de Estados Unidos, el Gobernador del Estado Libre Asociado de Puerto Rico podrá, si lo creyere conveniente para los mejores intereses del Estado Libre Asociado, ceder a Estados Unidos la jurisdicción sobre los terrenos adquiridos, sujeto a las condiciones que se estipulan en las secciones 54 a 57 de este título y a las demás condiciones que estime convenientes. La jurisdicción sobre tales terrenos por parte del Estado Libre Asociado de Puerto Rico continuará, sin embargo, hasta que el indicado funcionario haya aceptado, en representación de Estados Unidos, la cesión de jurisdicción y haya radicado en la Oficina del Gobernador una notificación a tal efecto." (Enfasis suplido.)
Interpretando en conjunto las disposiciones estatutarias antes citadas, se desprende que la existencia de jurisdicción federal sobre terrenos y estructuras adquiridos para la ubicación de correos no se presume. En vez, es necesario que el gobierno federal indique al gobierno estatal su deseo o necesidad de ejercer jurisdicción sobre el terreno envuelto y negocie los términos específicos de ésta. Una vez se ha llegado a un acuerdo entre las partes, este acuerdo se formaliza por documento que se presenta en la Oficina del Gobernador en el cual el funcionario federal expresa su aceptación de la jurisdicción exclusiva, bajo los términos acordados, a nombre del gobierno federal.
En cuanto a los aspectos procesales para establecer la jurisdicción federal exclusiva, nos indica el Tribunal Supremo en Pueblo v. Suárez, supra, a las págs. 910 a 911, que la jurisdicción federal, en tanto que es una jurisdicción excepcional, no se presume nunca. Al discutir dicho caso el Tribunal Supremo se expresó como *627 sigue:
"... No existiendo presunción legal alguna a favor de la jurisdicción federal invocada por el apelante, por el mero hecho de que en el edificio estuviese instalada una oficina de correos, el fiscal no estaba obligado a probar la negativa.... era el acusado a quien incumbía probar su afirmación, demostrando que el caso está comprendido, por excepción, dentro de la jurisdicción federal."
En el caso de autos el apelante se limitó a alegar que los incidentes ocurrieron en un correo federal, pero no adujo prueba alguna para sustentar que el gobierno federal hubiese solicitado y adquirido jurisdicción federal exclusiva sobre el terreno y estructuras envueltas. Similarmente, no ofreció evidencia de la aceptación de dicha jurisdicción por el gobierno federal, por medio de la presentación en la Oficina del Gobernador del documento en el cual la acepta, según requerido por 48 U.S.C.A. see. 255, supra. Concluimos que el apelante no demostró que el gobierno federal haya obtenido jurisdicción exclusiva sobre los terrenos en los que está ubicado el correo federal de la Avenida 65 de Infantería.
El señalamiento sobre falta de jurisdicción del tribunal apelado presentado por el apelante incluye una vertiente relacionada a la jurisdicción sobre la materia. En esencia, aduce que en tanto que existe legislación federal detallada respecto a delitos que envuelven el Servicio de Correos Federal, esto crea una situación de campo ocupado. No tiene razón el apelante. En Pueblo v. Castro García, 120 D.P.R. 740, 754-756 (1988), nuestro Tribunal Supremo, al examinar planteamientos relacionados a la jurisdicción concurrente en el área penal de los tribunales federales y estatales expuso:

"Puerto Rico está facultado, como si fuera un estado, para probar y hacer cumplir un código penal. Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592 (1982).

El Estado Libre Asociado, en el ejercicio de su autonomía, tiene jurisdicción para aplicar sus leyes penales a todas las personas que cometan delito dentro de su extensión territorial. La ley penal del cuerpo político aplica a todos los delitos cometidos dentro de su territorio. Se entiende por territorio de un estado el espacio comprendido dentro de sus fronteras.

Como hemos visto, el Gobierno federal y los gobiernos estatales tienen jurisdicción concurrente sobre un sinnúmero de actividades criminales: El Estado sobre el robo del banco, el Gobierno federal sobre el robo de una institución federalmente asegurada; el Estado sobre el hurto de autos, el Gobierno federal sobre la transportación interestatal de un vehículo hurtado y así sucesivamente." 

El mero hecho de que existan delitos, bajo los estatutos federales, relacionados con los correos no limita la jurisdicción de los tribunales estatales para los delitos incluidos en el Código Penal. Su efecto es crear una situación de jurisdicción penal concurrente para los delitos cometidos en los correos federales."

Concluimos que, en el caso de autos, el Tribunal de Primera Instancia tenía jurisdicción sobre la materia para adjudicar acusaciones por delitos tipificados en el Código Penal del Estado Libre Asociado de Puerto Rico.
No se cometió el primer error señalado.
III
En el segundo error plantea el apelante que incidió el Tribunal de Primera Instancia al no concederle el beneficio de la duda razonable y declararlo culpable de infracción al Art. 166 del Código Penal, 33 L.P.R.A. see. 4271. En la discusión de este error el apelante presenta dos líneas de argumento. En la primera objeta algunos de los comentarios que emitió el juez durante la vista del caso y en la segunda reclama que no se probó el delito imputado más allá de duda razonable. En particular, el apelante reclama que el juez descartó evidencia ofrecida por la defensa que no fue impugnada o refutada por fiscalía.
El apelante objeta, entre otras, las expresiones del juez recurrido donde éste define lo que él consideraba la controversia a dilucidarse (Exposición Narrativa, pág. 5, líneas 7 a 17; las expresiones sobre la pertinencia *628 del conteo de caja del 19 de septiembre de 1994, (Exposición Narrativa, pág. 15, líneas 38 a 43 y pág. 16, líneas 20 a 22); y las expresiones sobre la credibilidad que le merecía el testimonio de apelante, (Exposición Narrativa, pág. 18, líneas 30 a 46 y pág. 19, líneas 1 a 2). Las expresiones respecto a la credibilidad del testimonio del apelante fueron como sigue:

"Déjeme decirle, es que esto es una comedia de errores que no hay forma de uno creer el testimonio suyo caballero. Yo se lo adelanto a usted. Yo no hay forma que una persona razonable pueda creer el testimonio suyo. Eso es errores tras errores, olvidos, no hay ninguna persona que pueda haber estado en esta sala durante estos días que le vaya a creer esa versión suya caballero. O sea yo estoy seguro que ni la familia suya estuviera aquí oyéndolo a usted podía creer lo que usted dice. Porque comete errores el 24 se le trastocan la gaveta, el 25 de enero firma algo como que lo vendió que resulta que no lo vendió; el 25 de enero le pone una cantidad de $59.00 y pico que no existe porque ese día usted no vendió ese giro; esa versión suya no hay quien la crea caballero. Yo lo lamento mucho pero con esa versión, o no hay forma en que yo pueda creer esa versión, aún siendo lo más flexible y pensando que siempre se puede cometer un error. Cualquiera que brega con esto comete errores. Pero es error tras error caballero y yo puedo entender que usted cometió un error el 24, pero no puede seguir creyendo que sigue cometiendo errores sucesivamente."

El rol del juez en los juicios criminales en Puerto Rico, especialmente cuando el juicio se ventila por tribunal de derecho, fue discutido por el Tribunal Supremo en Pueblo v. Pabón, 102 D.P.R. 436 (1974). Este fue un caso visto por tribunal de derecho donde se alegó que el juez actuó "como juez fiscal, haciendo un número de preguntas proporcionalmente mayor a las formuladas por el fiscal, tratando de probar hechos no probados por el fiscal." A las páginas 440 y 441, el Tribunal Supremo expone la norma a seguirse y la aplica a la actuación del juez en dicho caso, como sigue:

"El juez no es el simple árbitro de un torneo medieval entre la defensa y el Ministerio Público o el retraído moderador de un debate. El juez es partícipe y actor principal en el esclarecimiento de la verdad y en la determinación de lo que es justo. El juez puede y debe ser en casos vistos con o sin jurado, aunque con mayor libertad en los segundos, participante activo en la búsqueda de la justicia, siempre que no vulnere la imparcialidad que su alto oficio reclama. Puede el juzgador en consecuencia requerir la declaración de determinados testigos o interrogar a los que las partes ofrezcan, siempre que su conducta se mantenga dentro de las normas de sobriedad y equilibrio que impiden que el juez sustituya, en vez de que complemente, la labor del fiscal o del defensor. Nada impide que un juez, para aclarar un testimonio o una situación, o consciente de que no se han formulado algunas preguntas centrales para la determinación de lo sucedido verdaderamente en un caso, se tome la iniciativa a dicho efecto.

A la luz de los principios expuestos el juez en el caso de autos actuó con entera mensura. Su intervención se limitó a esclarecer los hechos y obtener que se explicasen ciertas contradicciones. Sus preguntas reforzaron el caso del fiscal, pero pudo suceder lo contrario. Su conducta fue imparcial y encaminada a servir los fines de la justicia."

Hemos examinado la totalidad de la exposición narrativa de la prueba en el caso de autos, en particular las partes referidas en el alegato del apelante, a la luz de la norma de Pueblo v. Pabón, supra, y concluimos que, aunque algunas de las expresiones del juez de instancia no fueron las más afortunadas, su actuación no refleja parcialidad en el juzgador de los hechos, sino un esfuerzo genuino por entender un grupo de circunstancias poco usuales.
En la segunda línea de argumento el apelante reclama que no se probó el delito imputado más allá de duda razonable. En particular indica que el juez descartó evidencia ofrecida por la defensa, que no fue impugnada o contradicha por fiscalía.
Debemos determinar si la prueba de cargo, de ser creída por el juzgador, demuestra más allá de duda razonable los elementos constitutivos del delito imputado y la conexión del acusado con el delito. Esta es una función judicial que recae en nuestro Foro, pues "la determinación de si se ha probado la culpabilidad más allá de duda razonable es revisable como cuestión de derecho", Pueblo v. Miranda Ortiz, 117 D.P.R. 188, 191-192 *629 (1986); Pueblo v. Pagán Díaz, 111 D.P.R. 608, 621 (1981). Claro está, no nos compete evaluar la credibilidad de la prueba testifical ya que ello le corresponde al Tribunal de Primera Instancia que recibió la misma. El Código Penal define la apropiación ilegal en su Art. 165, 33 L.P.R.A. see. 4271, como:

"§ 4271. Apropiación ilegal

Toda persona que ilegalmente se apropiare sin violencia ni intimidación de bienes muebles, pertenecientes a otra persona, será sancionada con pena de reclusión por un término que no excederá de seis (6) meses, multa que no excederá de quinientos (500) dólares, pena de restitución, o cualquier combinación de éstas, a discreción del tribunal."

El Art. 166, en su inciso (b), 33 L.P.R.A. sec. 4272(b), dispone:

"§ 4272. Apropiación ilegal agravada

Será sancionada con pena de reclusión por un término fijo de diez (10) años, toda persona que cometiere el delito previsto en la see. 4271 de este título con la concurrencia de cualquiera de las siguientes circunstancias:

(a).

(b) Apropiándose de bienes cuyo valor fuere de doscientos (200) dólares o más;

En cualquiera de las circunstancias anteriores, de mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de doce (12) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) años.

El inciso cinco (5) del Art. 7, 33 L.P.R.A. see. 3022(5),

"Salvo que otra cosa resultare del contexto, las siguientes palabras y frases contenidas en el presente Código tendrán el significado que se señala a continuación:

5. Apropiare. -Incluye el malversar, defraudar, ejercer control ilegal, usar, sustraer, apoderarse, o en cualquier forma hacer propio cualquier bien o cosa en forma temporal o permanente."

El elemento mental requerido para configurar el delito de apropiación ilegal es la intención específica de apropiarse de los bienes. Pueblo v. Miranda Ortiz, 117 D.P.R. 188 (1986), Pueblo v. Padró Ríos, 105 D.P.R. 713, 716 (1977). Respecto al elemento de intención el Art. 14 del Código Penal, 33 L.P.R.A. see. 3061, dispone:

"§ 3061. Formas de culpabilidad

Nadie podrá ser sancionado por una acción que la ley provee como delito si la misma no se realiza con intención o negligencia criminal.

La intención o la negligencia se manifiestan por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona."

La prueba necesaria que el estado debe presentar es una suficiente que establezca más allá de toda duda razonable cada uno de los elementos del delito. Pueblo v. Sánchez Molina, 134 D.P.R. _ (1993), 93 J.T.S. 140; Pueblo v. Rodríguez Román, 128 D.P.R. _ (1991), 91 J.T.S. 26; Pueblo v. González Beníquez, 111 D.P.R. 167(1981).
Una vez creída la prueba por el juzgador, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, no se intervendrá con esa apreciación. Pueblo v. Maisonave Rodríguez, 129 D.P.R. _ (1991), 91 J.T.S. 73; Pueblo v. Hernández Mercado, 126 D.P.R. 427 (1990); Pueblo v. Torres Figueroa, 126 D.P.R. 721 (1990).
*630 De la exposición narrativa de la prueba y la prueba documental admitida en el caso se desprende que se probaron, entre otros, los siguientes hechos. Primero, que el 24 de diciembre de 1992 el apelante vendió el giro número 4781277998 (número 998) por quinientos dólares ($500), y no lo reflejó en el cuadre de efectivo recibido de ese día, ni incluyó la copia blanca del giro que se genera automáticamente al imprimirse el giro. Segundo, que en el cuadre de efectivo del 25 de enero de 1993 el apelante incluyó el giro número 998, pero con una cantidad de cincuenta y nueve dólares con ochenta centavos, ($59.80), o sea una cantidad menor a la real por cuatrocientos cuarenta dólares con ochenta centavos, ($440.80). Como respaldo de esta venta el apelante preparó un reemplazo de la copia del giro, indicando como fecha de venta el 25 de enero de 1993 y su cantidad $59.80. Tercero que el primer conteo de caja posterior al 24 de diciembre se efectuó el 8 de abril de 1993. Este reflejó una merma, o "cash short", de dieciocho dólares con treinta y siete centavos, ($18.37). Los hechos indicados, si la prueba es creída por el juzgador de hechos, son suficientes para demostrar la existencia de apropiación grave.
El elemento de intención surge de la totalidad de la prueba. El juez de instancia no creyó la versión propuesta por el apelante, hecho que en este caso en particular fue documentado por expresiones vertidas en corte abierta por el juez, las cuales citamos anteriormente. Al dirimir el aspecto de intención en contra del apelante, quedó establecida la intención específica de apropiarse de los bienes.
Como tribunal apelativo las determinaciones de credibilidad que hace el juzgador de los hechos a nivel de instancia nos es merecedora de gran deferencia. La razón para dicha deferencia fue expuesta por el Tribunal Supremo en Pueblo v. Cabán Torres, 117 D.P.R. 645, 654 (1986) como sigue:
"... El fundamento o base en que se apoya la referida norma es obvio: dicho juzgador es el que, de ordinario, está en mejor posición para aquilatar la prueba testifical ya que fue el que oyó y vio declarar a los testigos. Como expresamos en Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975):
... y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación...". (Enfasis en original.)
En tanto que los elementos del delito fueron establecidos con prueba suficiente en derecho, y que no hemos encontrado error manifiesto, pasión, prejuicio o parcialidad de parte del juzgador, concluimos que no incidió el tribunal apelado.
IV
Por las consideraciones anteriores, se confirma la sentencia dictada por el tribunal recurrido.
Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 96 DTA 159
1. Cuando los paquetes de giros son entregados a los oficiales de ventanillas, se procede a registrarlos, anotando la numeración de los giros en cada paquete. El oficial verifica sus giros, firma y anota la fecha en que recibió los mismos.
2. Esta sección proviene de 54 Stat. 304 del 11 de junio de 1940.
3. El texto citado de 40 U.S.C.A. § 255 proviene de 54 Stat. 19 del 1ro. de febrero de 1940.
*631 4. Pueblo v. Suárez no ha sido revocado y sus doctrinas han sido aplicadas reiteradamente, véase: Pueblo v. Fuentes, 56 D.P.R. 669 (1940); López v. Corte, 58 D.P.R. 115 (1941); Moore v. Corte, 59 D.P.R. 620 (1941); Montalvo v. Paul Smith Construction, Co., 64 D.P.R. 760 (1945), entre otros.
5. La nota al calce número 10 del caso citado indica:

"Esta jurisdicción local en el ámbito penal fue expresamente reconocida en el Art. XI de Tratado de' Paz de París, Bevans, II Trades and other International Agreements of the U.S., pág. 619, y C. Ramos de Santiago, El Desarrollo Constitucional de Puerto Rico, 2da ed., Río Piedras, Ed. Universitaria, 1979, pág. 36."

6. Pueblo v. Castro García, supra, pág. 757, reitera lo decidido por el Tribunal Supremo federal en United States v. Lanza, 260 U.S. 377, 382 (1922) que "[U]n acto denunciado como un crimen por las soberanías nacional y estatal es una ofensa contra la paz y la dignidad de ambas y puede ser castigado por ambas."
7. Según la exposición narrativa de la prueba, el juez expresó durante el interrogatorio del primer testigo lo siguiente:

"[Cjomo el juicio era por tribunal de derecho les iba a adelantar a las partes, los dos puntos claves que para el tribunal existían en el caso.... ¿ Cómo se le desapareció al acusado el giro que estaba bajo su custodia y por qué el acusado certificó algo, cuando eso no era cierto."

8. Este fue el primer conteo de caja después del 24 de diciembre de 1992. En tanto que los récords contables reflejaban el giro número 998 como vendido por $59.80, los $440.20 debieron haberse detectado en la forma de un sobrante significativo, lo cual no ocurrió.